UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

GLENDA ABSHIRE,                      CIVIL ACTION
          Appellant              NO. CV07-1856-LC

VERSUS

MICHAEL J. ASTRUE, COMMISSIONER    JUDGE JAMES T. TRIMBLE
OF SOCIAL SECURITY,              MAGISTRATE JUDGE JAMES D. KIRK
          Appellee

## REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

Glenda M. Abshire ("Abshire") filed applications for
disability insurance benefits ("DIB") and survivor's benefits on
February 18, 2005 and March 8, 2005, respectively, alleging a
disability onset date of September 24, 2003 (Tr. pp. 41, 149).
Those applications were denied by the Social Security
Administration ("SSA") (Tr. pp. 33, 155).

A de novo hearing was held before an administrative law judge
("ALJ") on April 24, 2007, at which Abshire appeared with her
attorney and a vocational expert ("VE") (Tr. p. 160). The ALJ
found that, although Abshire meets the non-disability requirements
for disabled widow's benefits (the prescribed period ended August
31, 2006) and suffers from discogenic and degenerative disorders of

the spine and depression, she has the residual functional capacity to perform her past relevant work as a safety coordinator and, therefore, was not under a disability as defined in the Social Security Act at any time through the date of the ALJ's decision on May 16, 2007 (Tr. pp. 13-21).

Abshire requested a review of the ALJ's decision, but the Appeals Council declined to review it (Tr. p. 4), and the ALJ's decision became the final decision of the Commissioner of Social Security ("the Commissioner").

Abshire next filed this appeal for judicial review of the Commissioner's final decision. Abshire raises the following issues for review on appeal:

> 1. The ALJ failed to make explicit and necessary findings as to the physical and mental demands of Abshire's past work.
>
> 2. The vocational testimony, on which the ALJ's decision is based, is facially unreliable as it conflicts with the Dictionary of Occupational Titles ("DOT").

Abshire and the Commissioner both filed briefs. Abshire's appeal is now before the court for disposition.

### Eligibility for Benefits

To qualify for disability insurance benefits, a plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act. 42 U.S.C. 416(i), 423. Establishment of a disability is contingent upon two findings. First, a plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that

2

has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. 423 (d)(1)(A). Second, the impairments must render the plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. 423(d)(2).

The Social Security Act established a three-pronged test for eligibility for disabled widow's benefits. To qualify for disabled widow's benefits, a claimant must establish that she is not married, is between 50 and 60 years old, and has a physical or mental impairment or impairments that, under the regulations promulgated by the Secretary, are deemed to be so severe as to preclude her from engaging in any gainful activity. Also, the claimant must show her disability began no later than seven years after the wage earner's death or seven years after she was last entitled to survivor's benefits. 42 U.S.C. § 402(e); 20 C.F.R. § 404.335.

### Scope of Review

In considering Social Security appeals such as the one that is presently before the Court, the Court is limited by 42 U.S.C. §405(g) to a determination of whether substantial evidence exists in the record to support the Commissioner's decision and whether there were any prejudicial legal errors. McQueen v. Apfel, 168 F.3d 152, 157 (5th Cir. 1999). For the evidence to be substantial, it must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance. Falco v. Shalala, 27 F.3d 160, 162 (5th Cir. 1994),

3

citing <u>Richardson v. Perales</u>, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 482 (1971). Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence which support the Commissioner's decision but must include a scrutiny of the record as a whole. The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight. <u>Singletary v. Bowen</u>, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry factual issues, reweigh evidence, or substitute its judgment for that of the fact-finder. <u>Fraga v. Bowen</u>, 810 F.2d 1296, 1302 (5th Cir. 1987); <u>Dellolio v. Heckler</u>, 705 F.2d 123, 125 (5th Cir. 1983). The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than the court. <u>Allen v. Schweiker</u>, 642 F.2d 799, 801 (5th Cir. 1981). Also, <u>Anthony v. Sullivan</u>, 954 F.2d 289, 295 (5th Cir. 1992). The court does have authority, however, to set aside factual findings which are not supported by substantial evidence and to correct errors of law. <u>Dellolio</u>, 705 F.2d at 125. But to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence." <u>Johnson v. Bowen</u>, 864 F.2d 340 (5th Cir. 1988); <u>Dellolio</u>, 705 F.2d at 125.

### Summary of Pertinent Facts

At the time of her 2007 administrative hearing, Abshire was 52 years old (Tr. p. 164), had one and a half years of college (Tr. p.

4

170), and past relevant work experience as a safety coordinator for a construction business (Tr. p. 167).

## 1. Medical Records

In December 2003, Abshire underwent an EMG, a motor conduction study, and a sensory conduction study for complaints of a history of paresthesia and dull, aching discomfort in her neck, on the left, with occasional paresthesia in her left hand (Tr. p. 87). The neurologist found mild entrapment of the median and ulnar nerve at the wrist with no associated denervation, and mild C7 radiculopathy, which appeared to be the primary etiology of Abshire's symptoms (Tr. p. 87). An MRI of Abshire's cervical spine, in January 2004, showed spondylotic changes at C3-4 with mild diffuse disc bulging and mild spinal stenosis (Tr. pp. 85-86, 104-105). There was also a bony spondylotic change and diffuse disc bulging at C4-5 having mass effect on the cervical subarachnoid space, anterior aspect of the cervical spinal cord, mild narrowing of the neural formina bilaterally, and mild to moderate spinal stenosis there (Tr. pp. 85-86, 104-105). At C5-6, there was bony hypertrophic spurring and spondylotic changes associated with diffuse disc bulging causing moderate spinal stenosis and narrowing of the neural foramina bilaterally at (Tr. pp. 85-86, 104-105).

In January 2004, Abshire underwent physical therapy (Tr. pp. 91-97). In March 2004, Abshire had a stress echo test due to complaints of chest pain; that test was negative (Tr. p. 99). Also in March 2004, Abshire had a cervical epidural steroid injection to

treat her cervical disk disease (Tr. p. 102).

Abshire's chiropractor, William P. Fey, Jr. stated that he initially saw Abshire in November 2004, when she complained of pain in the left side of her neck, radiating down her left arm, which began in September 2003, although she had similar problems since a motor vehicle accident in 1972 (Tr. p. 121). Fey's diagnosis, based on x-rays and examination, was left C5 radiculopathy with disc degeneration at C5-6; he noted that Abshire did not respond to spinal manipulation and therapy and referred her to an orthopaedic surgeon (Tr. pp. 121-122).

In January 2005, Abshire was evaluated by Dr. John W. Noble, Jr. at the Center for Orthopaedics (Tr. p. 107-109). Abshire was 5'5" and weighed 117 pounds (Tr. p. 108). Dr. Noble found that Abshire had a normal range of motion in her neck and shoulders, shoulder pain, normal motor strength in her upper extremities except in the left abductors and left hand, and her Babinski sign and clonus were absent in her reflexes (Tr. p. 108). Dr. Noble diagnosed cervical stenosis at C4-5 and C5-6, C5 radiculopathy, and spondylolysthesis at C4-5 with multi-level spondylosis, and recommended that Abshire undergo a trial of cervical epidural steroid injections (Tr. p. 109). In February 2005, Abshire reported no improvement from the cervical epidural steroid injection, she was diagnosed with cervical stenosis and cervical radiculopathy, and Dr. Noble recommended that she undergo surgical intervention (Tr. p. 106). Abshire was treated by her chiropractor in March 2005 (Tr. pp. 110-119).

6

Dr. Jovan M. Popovich, a rheumatologist, examined Abshire and reviewed her medical records in June 2006 for complaints of fibromyalgia and pain all over; he last examined Abshire in June 2005 (Tr. p. 133). Dr. Popovich noted that Abshire had originally reported having tried Celebrex, Relafen, Bextra, Aleve, Vicodin, Darvocet, and Tramadol, physical therapy, and exercising, had a history of depression and was taking multiple antidepressants, had a history of headaches, tiredness, fatigue, and poor sleep, and had neck problems, nerve entrapment, and degenerative discs in the spine (Tr. pp. 133, 137-138). Dr. Popovich diagnosed fibromyalgia with continued pain in the soft tissues, tiredness, fatigue, and multiple tender spots, osteoarthritis of the hands, history of low back pain, cervical spondylosis with history of mild C6/7 radiculopathy, history of median and ulnar entrapment at the wrist on the EMG, and history of depression and panic attacks (Tr. p. 134). Dr. Popovich prescribed Lexapro and Lyrica, and placed Abshire on an exercise program (Tr. p. 134). In 2005 and 2006, Dr. Popovich stated that he found Abshire's soft tissues showed multiple tender spots consistent with fibromyalgia in 18 out of 18 spots (Tr. pp. 134, 138, 142).

## 2. Administrative Hearing

At her April 2007 administrative hearing, Abshire testified that she was 52 years old, a widow, has three grown children, and lives with her 27 year old daughter, her son-in-law, and her five-year-old grandson (Tr. pp. 164-165). Abshire testified that she also has five other grandchildren (Tr. p. 165). Abshire testified

that she lost her house in Hurricane Rita, so she moved in with her children (Tr. p. 166). Abshire testified that her sole income is from her husband's life insurance proceeds (Tr. p. 166); she is still fighting with her homeowner's insurer over damages to her home from Hurricane Rita (Tr. p. 167). Abshire testified that her children provide her with food, clothing, and shelter (Tr. p. 166).

Abshire testified that she last worked full time in December 2004 as a safety coordinator for the construction business she and her husband owned, which her son took over after Abshire's husband died; they went out of business in December 2004 because the oil field industry "decreased" (Tr. pp. 167-168). Abshire testified that she stopped working for the construction company in December 2004 because her symptoms were getting progressively worse and she could no longer do things like type or write (Tr. p. 169). Abshire testified that she was the safety coordinator for the construction company from 1992 through December 2004, which involved conducting safety meetings for the employees, filing, and typing; she usually worked out of her house (Tr. p. 169). When her husband died, Abshire became president and owner of the company and received that salary, but her son actually managed the company; Abshire did not run the company, but continued to work as the safety coordinator (Tr. pp. 191-192). Abshire further testified that, before working for her husband's company, she worked for Mobil Oil and Boeing as an engineering aide from 1974-1979 (Tr. pp. 171-172).

Since 2004, Abshire testified that she has worked about ten days (non-consecutive) as a substitute teacher, but testified that

8

she is not able to do that because most days she feels too bad to work (Tr. pp. 168-169).

Abshire testified that she has problems with her neck and back, and has fibromyalgia and arthritis in her hands (Tr. p. 172). Abshire testified that the fibromyalgia causes chronic fatigue, sleep disturbance, irritable bowel syndrome, and pain all over (Tr. p. 172). Abshire testified that she has spinal stenosis and spurs in her neck, and has had about six spinal injections, including cortisone shots and one epidural (Tr. pp. 173-174). Abshire testified that the first spinal injection helped, but the second one did not (Tr. p. 174). Abshire testified that she suffers from depression, for which she has been seeing a psychologist once a month since 1999 and has been consistently taking anti-depressants such as Elavil, Zoloft, Effexor, Lexapro, and Cymbalta (Tr. pp. 174-177). Abshire testified that her nurse-practitioner and her rheumatologist, Dr. Popovich, have both prescribed anti-depressants for her (Tr. p. 176).

Abshire testified that she sees Dr. Popovich, once a year for management of her fibromyalgia (Tr. pp. 177-178). Abshire testified that she also sees a gynecologist, and goes to the local nurse practitioner when she is sick (Tr. pp. 178-179).

Abshire testified that the arthritis in her hands causes tingling, numbness, and pain, and she drops things (Tr. p. 193); tests showed she has some nerve entrapment (Tr. p. 193). Abshire testified that her hands hurt when she grips something or after about five minutes of writing (Tr. p. 194). Abshire testified that

she has trouble picking up small things and working with small objects, and with fine manipulation (Tr. p. 194). Abshire testified that she is no longer able to knit or crochet (Tr. p. 194), can no longer do filing and cannot use a computer keyboard for more than about ten minutes (Tr. pp. 195-196).

Abshire testified that she can sit for fifteen to twenty minutes before her neck and shoulder start hurting, stand for twenty to thirty minutes before her legs start hurting, walk ten to fifteen minutes, and lift five to eight pounds (Tr. p. 179). Abshire testified that she cannot vacuum, sweep, or mop, cannot open a previously unopened jar, and cannot reach very high, but can blow-dry her hair (Tr. pp. 199-202). Abshire testified that she is usually home alone during the day, she takes a long hot bath in the morning, then has coffee and breakfast, she folds clothes after her daughter takes them out of the dryer, watches TV, reads, sometimes a friend picks her up and takes her into town to visit her parents or look at her house, and sometimes she drives herself (depending on the type of medication she took the night before); she does not sleep well at night due to pain (Tr. pp. 179-181). Abshire testified that she sees her friends once or twice a week (Tr. p. 181). Abshire testified that she seldom uses a computer, but does so to keep up with the status of her claim in the post-hurricane financial aid program for repairing her home (Tr. pp. 181-182). Abshire testified that she does not e-mail her friends or shop online (Tr. p. 183). Abshire testified that she likes to read, but does not have any other hobbies (Tr. pp. 183-184). Abshire also

10

testified that she sometimes visits her son and his family and reads to her grandchildren, but Abshire does not babysit her grandchildren (Tr. pp. 184-185). Abshire testified that she vacationed with her family in San Antonio/New Braunfels the previous summer; although they drove there, Abshire did do any of the driving (Tr. pp. 185-186). Abshire testified that she mostly just laid around on vacation and did not go to the water park (Tr. pp. 197-198). Abshire testified that she has done yoga and stretching, on her doctor's advice, since 2005; she does it at home (Tr. pp. 186-187). Abshire also walks for about ten minutes at a time (Tr. p. 188).

Abshire testified that she cannot do any type of work because she is tired and has no energy in the mornings, especially if she took Benadryl the night before to help her sleep, and she is in pain all the time, so she has to take hot baths and use heating pads and heated herbal pillows (Tr. pp. 189-190). Abshire testified that she has difficulty concentrating and cannot endure an eight hour work day with out heating pads (Tr. pp. 202-203). Abshire testified that she can no longer do paperwork because of the problems with her hands and because she cannot sit very long, cannot write very long, cannot use a computer keyboard very long, cannot hold a phone very long because it hurts her neck, cannot pull something heavy out of a filing cabinet, and would not be able to flip through files (Tr. pp. 203-207). Abshire also testified that she would miss work three or four days a month if she worked (Tr. p. 222).

Abshire testified that she has had neck problems since 2003, which decrease her range of motion so she has difficulty tilting her head left, right, or back (Tr. p. 207). Abshire testified that her neck problems make it difficult for her to drive, since she has trouble looking over her shoulder (Tr. p. 208).

The VE testified that Abshire's past work as a safety coordinator was sedentary, skilled work (Tr. p. 210), and her past work as a substitute teacher was light, skilled work (Tr. p. 210).

The ALJ posed a hypothetical involving an individual closely approaching advanced age, with a high school education plus one and half years of college, and the residual functional capacity to perform light work with a sit/stand option, the ability to walk four hours in an eight hour day, a limited ability to climb stairs, ladders, ropes, scaffolds, or run, limited overhead reaching, no limits on her ability to push/pull or use gross and fine motor skills, and has the ability to get along with others, understand detailed instructions, concentrate and perform detailed tasks, and respond or adapt to workplace changes and supervision (Tr. p. 212). The VE testified that such a person can perform Abshire's past relevant work (Tr. p.212).

The VE further testified that Abshire has transferable skills, such as information sharing, scheduling, planning, directing, coordinating policy and procedures and distributing them through oral or written modalities to other employees to train them in matters of safety and conservation of equipment, her knowledge of the tools and trades of safety and presentation, and her training

skills (Tr. pp. 213-214).

In response to a second hypothetical involving a person with the residual functional capacity to perform sedentary work, with the same other limitations and abilities as set forth in the first hypothetical, the VE testified the person could perform Abshire's past relevant work (Tr. pp. 213-214). The VE further testified that such a person, with Abshire's transferrable work skills, could also do semi-skilled work as a scheduler (sedentary or light work) (DOT No. 215.367-014), an information clerk (DOT No. 237.367-022), a referral clerk (DOT No. 205.367-062), or an admission clerk (Tr. pp. 215-).

In response to the further limitation that the person is limited to only occasionally rotating her neck left or right and looking down for only five to seven minutes before taking a break, the VE testified that most jobs require frequent, brief looking down, but not looking down for extended periods of time (Tr. pp. 217-218). With the additional limitations of only occasional fine manipulation, limited handling, and limited fingering, the VE testified the person could still work as an information clerk, and could probably still perform the other jobs (Tr. p. 219). The VE testified that the need to lie down once a day for about an hour, or twice a day for thirty minutes, or take unscheduled five to ten minute breaks, would eliminate all competitive employment (Tr. pp. 220-221). The VE testified that consistently missing work twice a month would not affect the person's employment, but she could not miss more than that (Tr. p. 221).

13

To determine disability, the ALJ applied the sequential process outlined in 20 C.F.R. §404.1520(a) and 20 C.F.R. §416.920(a). The sequential process required the ALJ to determine whether Abshire (1) is presently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"); (4) is unable to do the kind of work she did in the past; and (5) can perform any other type of work. If it is determined at any step of that process that a claimant is or is not disabled, the sequential process ends. A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den., 914 U.S. 1120, 115 S.Ct. 1984, 131 L.Ed.2d 871 (1995), citing Lovelace v. Bowen, 813 F.2d 55, 58 (5th Cir.1987).

To be entitled to benefits, an applicant bears the initial burden of showing that she is disabled. Under the regulations, this means that the claimant bears the burden of proof on the first four steps of the sequential analysis. Once this initial burden is satisfied, the Commissioner bears the burden of establishing that the claimant is capable of performing work in the national economy. Greenspan, 38 F.3d at 237.

In the case at bar, the ALJ found that Abshire has not engaged in substantial gainful activity since January 1, 2005, that her entitlement to widow's benefits began on August 10, 1999 and ran

14

through August 31, 2006, and that she has severe impairments of discogenic and degenerative disorders of the spine and depression, but that she does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1 (Tr. pp. 13-17). The ALJ then found that Abshire retained the residual functional capacity to perform her past relevant work as a safety coordinator through the date of his decision on May 16, 2007 (Tr. pp. 20-21). The sequential analysis thus ended at Step 4, with a finding that Abshire was not disabled (Tr. p. 21).

<u>Law and Analysis</u>

Abshire contends the ALJ failed to make explicit and necessary findings as to the physical and mental demands of Abshire's past work, and that the vocational expert's testimony is facially unreliable because it conflicts with the DOT.

Initially, the burden is on the claimant to demonstrate that she cannot perform her previous work, that she is unable to engage in substantial employment, and that she meets the duration requirement. <u>Chaparro v. Bowen</u>, 815 F.2d 1008, 1010 (5th Cir. 1987). It is only if the claimant proves that she is unable to engage in her past relevant work (Step 4) that the burden of proof shifts to the Secretary to show that the claimant is able to perform some other type of substantial work in the economy (Step 5). <u>Greenspan v. Shalala</u>, 38 F.3d 232 (5th Cir. 1994); <u>Scott v. Heckler</u>, 770 F.2d 482, 484 (5th Cir. 1985); <u>Ferguson v. Schweiker</u>, 641 F.2d 243, 246 (5th Cir. 1981).

The mere inability of a claimant to perform certain

15

requirements of her past work does not mean that she is unable to perform past relevant work as that phrase is used in the regulations. The Commissioner may consider the description of the claimant's past work as such work is generally performed in the national economy. Leggett v. Chater, 67 F.3d 558, 564 (5ᵗʰ Cir. 1995). The mere inability of a claimant to perform certain requirements of his past job does not mean that he is unable to perform past relevant work as that phrase is used in the regulations. Leggett, 67 F.3d at 564. See also, Social Security Ruling 82-61.

Abshire argues, specifically, that the job of safety coordinator, as set forth in the DOT, 012.167-058, is a skilled job with a reasoning level of 6.[1] Abshire contends that reasoning level 6 is inconsistent with the ALJ's finding that she is only able to understand detailed instructions and concentrate on and perform detailed tasks.

Contrary to Abshire's argument, the ALJ did not find Abshire is "only" able to understand detailed instructions and concentrate on and perform detailed tasks, in a restrictive, limiting sense as alleged by Abshire. Rather, the ALJ stated that Abshire *is able to*

_____

[1] According to the DOT, an "06 level reasoning development" requires a worker to: "Apply principles of logical or scientific thinking to a wide range of intellectual and practical problems. Deal with nonverbal symbolism (formulas, scientific equations, graphs, musical notes, etc.) in its most difficult phases. Deal with a variety of abstract and concrete variables. Apprehend the most abstruse classes of concepts." The VE testified that Abshire is able to perform her past work as a safety coordinator with the residual functional capacities as described by the ALJ in the first and second hypotheticals.

understand detailed instructions and concentrate on and perform detailed tasks, and did not mention any limitations in that regard.

Moreover, Abshire is confusing the Social Security Regulations with the DOT. The Social Security Regulations have only two categories of abilities with regard to understanding and remembering instructions - either "short and simple," or "detailed" or "complex", 20 C.F.R. 416.969a(c)(1)(iii) - while the DOT has six levels for measuring this ability, <u>Dictionary of Occupational Titles</u>, Appendix III, *available at* http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPP.HTM. See also, <u>Meissl v. Barnhart</u>, 403 F.Supp2d 981, 984 (C.D.Cal. 2005). Obviously, level six reasoning, the highest level of reasoning in the DOT, falls within the social security regulations category of "detailed" or "complex." The ALJ did not, as Abshire claims, find she is capable only of jobs requiring no more than level 2 or level 3 reasoning.[2]

Abshire further argues the VE failed to identify, explain, or resolve the "conflict" between Abshire's work as a safety coordinator, as she actually perform it, and the job as described in the DOT. However, Abshire did not question the VE about this purported conflict at her administrative hearing. To the extent that there is any implied or indirect conflict between the vocational expert's testimony and the DOT in this case, the ALJ may rely upon the vocational expert's testimony provided the record

---

[2] In any event, the VE also testified that Abshire could work as an information clerk, which has a reasoning level of 4. See DOT 237.367.022-Information Clerk.

17

reflects an adequate basis for doing so. All kinds of implicit conflicts are possible and the categorical requirements listed in the DOT do not and cannot satisfactorily answer every such situation. Moreover, claimants are not permitted to scan the record for implied or unexplained conflicts between the specific testimony of an expert witness and the voluminous provisions of the DOT, and then present that conflict as reversible error, when the conflict was not deemed sufficient to merit adversarial development in the administrative hearing. The Fifth Circuit has stated the correct approach to resolving such a conflict is whether there is substantial evidence supporting the Commissioner's determination that this particular person can do this particular job or group of jobs. Carey v. Apfel, 230 F.3d 131, 142 (5th Cir. 2000).

Abshire did not question the VE about the reasoning requirements of her work as a safety coordinator, but only questioned the VE concerning her ability to perform the physical requirements of the job. Since Abshire did not challenge the VE's testimony, at her hearing, concerning any differences between the job of safety coordinator as described in the DOT and the job as she actually preformed it, Abshire may not now raise an issue as to a purported conflict between her actual job and the description of that job in the DOT.[3] Moreover, the mere inability of a claimant to perform certain requirements of her past work does not mean that she is unable to perform past relevant work as that phrase is used

---

[3] It is noted that Abshire does not allege that, or describe how, her past relevant work as a safety coordinator was not as described in the DOT.

18

in the regulations. The Commissioner may consider the description of the claimant's past work as such work is generally performed in the national economy. Leggett v. Chater, 67 F.3d 558, 564 (5th Cir. 1995). See also, Social Security Ruling 82-61.

Abshire also contends the ALJ failed to make explicit and necessary findings as to the physical and mental demands of Abshire's past work as a safety coordinator. Abshire points out that the ALJ stated in his decision (when determining whether Abshire meets Listing 12.04 for depression) that he found Abshire has mild restrictions of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace (Tr. p. 18). However, the ALJ also stated there was no clinical examination or psychological testing to confirm Abshire's complaints of difficulty with attention and concentration (Tr. p. 18). Apparently, the ALJ gave Abshire the benefit of the doubt based on her subjective complaints when he found she had moderate difficulties in maintaining concentration, persistence, or pace. Abshire only testified at her hearing that she cannot fulfill the physical demands of her past work as a safety coordinator. Since the medical evidence does not support Abshire's contention, raised only on appeal, that she cannot fulfill the mental demands of her past relevant work, Abshire has not carried her burden of proving she cannot perform her past relevant work due to mental deficiencies.

The vocational expert's clear and unchallenged testimony that Abshire can perform her past relevant work is adequate, in the

context of this record as a whole, to support the ALJ's determination that Abshire can perform either her past work or other available work. The ALJ's finding that Abshire could perform her past relevant work indicates the ALJ's conclusion that Abshire did not meet her burden of proving that she could not return to such work. Substantial evidence supports the ALJ's/Commissioner's conclusion that Abshire can perform her past relevant work as a safety coordinator.

## Conclusion

Based on the foregoing discussion, ITS IS RECOMMENDED that the final decision of the Commissioner be AFFIRMED and that Abshire's appeal be DISMISSED WITH PREJUDICE.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), the parties have **ten (10) business days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **ten (10) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the district judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN TEN (10) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND**

**LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Alexandria, Louisiana, on this 28th day of October, 2008.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE